UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────

N° 08 Civ. 6917 (RJS)

───────────────

DARLENE MCCAFFREY, as administratix of the estate of
Patrick McCaffrey, deceased,

Plaintiff,

VERSUS

MILLENNIUM PIPELINE COMPANY, LLC AND
MBF SERVICES, INC.,

Defendants.

───────────────

OPINION AND ORDER
September 1, 2010

───────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff Darlene McCaffrey, as administratrix of her late husband Patrick's estate, seeks compensation for his injuries and death resulting from a 2007 construction accident. Defendants Millennium Pipeline Company, LLC and MBF Services, Inc., are, respectively, the owner of the construction project and the management company hired to oversee safety on the project. Millennium, in turn, has brought a third-party complaint against Precision Pipeline LLC, McCaffrey's employer and the general contractor for the project, seeking contractual indemnification. MBF has also brought a cross-claim against Millennium for indemnification. In addition, Precision has brought a counter-claim against Millennium and a cross-claim against MBF for indemnification. Now before the Court are motions for summary judgment made by Plaintiff, Millennium, and MBF.

For the reasons set forth below, Plaintiff's motion for summary judgment — which only seeks liability on a single claim — is granted in its entirety. Defendants' motions are each granted in part and denied in part.

I.   BACKGROUND[1]

A.   Parties

Millennium is a company organized to construct the Millennium Pipeline, a 181-mile, thirty-inch-diameter pipeline carrying natural gas from Corning, New York to Ramapo, New York. (Aff. of Gary Kruse Ex. P at 5.) Millennium hired Precision to provide general contracting services and MBF to provide inspection and construction-management services in connection with that project. (Millennium 56.1 ¶¶ 2, 5.) Precision employed Patrick McCaffrey. (Pl.'s 56.1 ¶ 2.)

B.   The Accident

On September 15, 2007, McCaffrey was operating a CAT 823T Pipelayer, known as a "side-boom," that weighed approximately 100,000 pounds. (Pl.'s 56.1 ¶ 2.) The side-boom was equipped with a roll over protective system, or safety cage, and a seat belt. (OSHA Report at 4.)[2] Precision's superintendent, Russell Fisher, stated that operators like McCaffrey were encouraged, but not required, to wear the seat belt. (Kownacki Decl. Ex. E (Dep. Tr. of Russell Fisher) 33:18-34:4.) Similarly, the manufacturer recommended that the operator wear the seat belt but did not require it. (OSHA Report at 4.)

McCaffrey was working on a section of the pipeline running through Harriman State Park, described by Fischer, as "forested and mountainous" terrain. (Fischer Dep. Tr. 13:14-17.) McCaffrey was operating his equipment on a three- to four-hundred foot slope, along with two other side-booms. (*Id.* at 16:15, 24.) The side-booms were used to lower the pipe into the ditch and hold it in place, slightly above the bottom of the ditch, until welders could connect the pieces of pipe. (*Id.* at 27:21-28:4.) McCaffrey's side-boom was located on the upper part of the hill, which had a slope of 27 to 35 degrees. (*See* Pl.'s 56.1 ¶ 5.)[3] The slope itself was

---

[1] The following facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with the motions. Where only one party's Rule 56.1 statement is cited, the opposing parties do not dispute that fact or have offered no admissible evidence to controvert that fact.

[2] Three separate reports were generated as a result of the accident. First, Precision generated a report in the regular course of its business. (*See* Decl. of David P. Kownacki Ex. B ("Precision Report").) The Occupational Safety and Health Administration ("OSHA") also produced a report. (*See id.* Ex. C (the "OSHA Report").) Finally, Daniel Hopper, an MBF inspector who worked on the Millennium project at the time of the accident, prepared a "Fatal Accident Investigation and Report." (*See* Affidavit of Daniel T. Hopper, Jr.; *id.* Ex. 1 (the "Hopper Report").) Hopper states that the report was generated in the normal course of his responsibilities at MBF, that the report was made in the normal course of business for MBF, that he was qualified to write the report, and that it was prepared on the date of the accident. (*See* Hopper Aff.) He also affirms that the report is based on his personal knowledge or information provided to him by those with personal knowledge of the events and who had a business obligation to report such information. (*Id.*) The owner of MBF, however, states that the creation of the report was not within Hopper's duties as a safety inspector. (*See* Kownacki Decl. Ex. G (Dep. Tr. of Mark Daniels) 23:6-25.) There is no dispute, however, that Hopper was an MBF safety inspector at the time he prepared the report. (*See id.* at 23:24-24:2.) There can similarly be no dispute that the safety of the worksite is within the scope of a safety inspector's employment. Accordingly, the Court need not resolve whether the report is a business record because it is admissible, at least against MBF, the objecting party, as a statement of a party opponent. *See* Fed. R. Evid. 801(d)(2)(D); *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003).

[3] The OSHA report states that the grade was 32 degrees (OSHA Report at 3), the MBF Report states that the grade was 27 to 33 degrees (Hopper Report at 1), and the Precision Report states that the grade was 33 to 35 degrees (Precision Report at 1).

covered with loose rock and dirt dislodged by earlier blasting. (*See* Precision Report.) McCaffrey was operating the side-boom located the farthest up the hill and, in conjunction with another side-boom, was supporting a 160-200-foot piece of pipe. (*Id.*) The third side-boom was holding another portion of pipe at the bottom of the slope. (*Id.*)

The lifting and welding of the pipe was being coordinated by a Precision foreman. (*Id.*) When he gave the signal, both side-booms lifted the uphill section of the 35,000- to 37,000-pound pipe. (*Id.*) At the further direction of the foreman, the operators stopped the lift and held the pipe steady. (*Id.*) Immediately thereafter, a "weight shift" occurred between the side-booms, causing McCaffrey's side-boom to tilt straight back, with its nose in the air, and then roll backward. (*Id.*) After righting itself for a brief second, the side-boom continued rolling backward, and McCaffrey was either ejected or jumped from the equipment. (*Id.*) The machine continued rolling down the hill, crushing McCaffrey, and then made three to five more revolutions before coming to rest upside down at the bottom of the hill. (*Id.*) McCaffrey died at the site as a result of his injuries. (*Id.*)

C. Relationship Between the Companies

1. MBF's Role

MBF was hired to provide "construction management" and "inspection" services for the Millennium project. (Kownacki Decl. Ex. F (Dep. Tr. of Gary Kruse) 9:25-10:5.) A document entitled Construction Management and Inspection Procedure, incorporated into the professional services agreement between MBF and Millennium, states:

Over the years, the role of the project inspector has changed[.] [I]n addition to ensuring compliance with Project Drawings, increased accountability for Safety, Environmental, DOT compliance, cost control, quality control, project records, and general Site Administration duties have been added to your responsibilities.

(Kruse Aff. Ex. M at 1.) It further states that the "primary focus of the Construction Inspector is to support the Project Team in the attainment of project goals by serving as the primary interface between [Millennium] and [Precision] at the construction sites. The task is accomplished by proactively working to ensure the Contractor[s] meet the project scope, cost, quality, safety, and schedule expectations." (*Id.*) More specific duties included "[p]roactively identify[ing] potential . . . safety opportunities, issues, or concerns," "[w]ork[ing] with the contractor, project team members and operations to address [the same]," and "[h]alt[ing] work where unsafe conditions are identified." (*Id.* at 4-5; *accord* Daniels Dep. Tr. 22:7-13 (agreeing that all MBF inspectors had the "right and obligation" to stop work where any unsafe conditions existed).) In addition, every inspector was required to "proactively monitor [the] site to ensure ALL SAFETY rules, regulations, and procedures are being practiced." (Kruse Aff. Ex. M at 8.)

Thus, MBF "provided on-site supervisors who had the authority to stop the work in order to remedy any safety violations or potential hazards." (Pl.'s 56.1 ¶ 3.)[4] Its obligations included providing

---

[4] MBF disagrees with this statement. (*See* MBF's Rule 56.1 Counter-Statement ¶ 3.) Like many of its other objections, however, the evidence relied on by MBF does not support its objection. In this case, MBF relies on Daniels's deposition, transcript page

3

daily inspections of the work site, crews, and equipment. (*Id.* ¶ 4; Fisher Dep. Tr. 32:1-16.) Before carrying out their responsibilities, the MBF inspectors participated in a seminar conducted by OSHA, New York State, and Millennium in order to familiarize themselves with relevant safety regulations. (Daniels Tr. 17:6-18:22.)

MBF also promulgated a "Health, Safety, and Environmental Manual" for use on all of its projects. (Daniels Dep. Tr. 10:11-11:6; *see also* Kownacki Decl. Ex. H (the "MBF Manual")). The manual stated that inspectors, including the chief inspector, were obliged to "[m]onitor[] and assure [that] all general and site-specific health, safety, and environmental rules and OSHA regulations are enforced." (MBF Manual at 14.) It also required that the MBF supervisors "[b]e knowledgeable of the hazards associated with each operation," "[e]nforce all safety and environmental rules and regulations," "[p]erform safety and environmental evaluations as frequently as necessary to ensure that physical and mechanical hazards or unsafe work practices are prevented or properly controlled," and "[w]here inherent hazards exist and cannot be eliminated, familiarize the work group with the situation and develop a safe method for controlling it." (*Id.* at 16; *accord* Daniels Dep. Tr. 25:4-14 (agreeing that it was the job of MBF inspectors to "enforce all safety and environmental rules and regulations," including "inspect[ing] and evalut[ing] the job site as frequently as necessary to [e]nsure the safety regulations were complied with").)

At least three MBF inspectors were at the scene of the accident on the morning of August 15, 2007. First, a welding inspector, Jack Dunsmore, was standing behind two trucks monitoring the suspended pipes for proper alignment, when he heard a "loud pop" uphill. (Affirm. of Manny Ayala Ex. 1 51:6-20.)[5] When he looked up, he saw McCaffrey's side-boom rolling down the hill. (*Id.*) Charles Galloway, an MBF paddling and backfilling inspector, noticed that McCaffrey had been having trouble operating his side-boom even before the accident. (*Id.* Exhibit 1 at 58:17-59:20.) According to Galloway, McCaffrey's side-boom had encountered "skids" and was "having a little trouble getting up" the hill. Galloway also opined that, if he had been operating the side-boom, he would have wanted it tied off to a bulldozer given the trouble McCaffrey was having getting up the hill. (*Id.* at 62:24-63:6.) Darrell Glen, another MBF inspector, was also on the site and responded to the accident. (*Id.* at 59:8-9.)

2. Indemnification Agreements

Millennium had indemnification agreements with both Precision and MBF. Millennium's relationship with MBF is governed by a professional services

---

16, lines four through eight, which contains the following question and answer: "Q: Was it the job of the inspectors and their supervisors to make sure that all applicable safety regulations were complied with on that job? A: Yes." This does not contradict the evidence relied on by Plaintiff. In fact, later in Daniels's deposition, the following question and answer took place: "Q: If an MBF employee, for example a craft inspector, had his own concerns of the safety of an operator on a hill that he was working on, would it have been [the] MBF employee's responsibility to express that concern to someone? A: It would have. Q: If he failed to express that concern, would that be in contravention or in contradiction of his responsibilities and duties as MBF dictated them to be? A: It would." (Daniels Dep. Tr. 59:17-23.) Accordingly, MBF's objection to paragraph three of Plaintiff's Rule 56.1 statement is without merit.

[5] MBF objects to the admission of any of its employees statements on hearsay grounds. The statements are admissible against MBF as statements of a party opponent. *See supra* note 2.

4

agreement, dated April 23, 2007, which contains the following indemnification provision:

> **Liability, Indemnity and Damages:** [MBF] shall reimburse [owner group][6] . . . and indemnify, defend, protect, and hold harmless owner group from and against any and all claims (including without limitation claims of strict liability, negligence, and of liability imposed by statutes, rules or regulations), suits, fines, costs (including attorneys' fees) brought by, or liabilities to or judgments in favor of, any person, firm or organization for bodily injury or death to any person (including without limitation, the employees of [Millennium] and [MBF] and its subcontractors) . . . arising, directly or indirectly, from (1) the activities of [MBF], its employees, agents, contractors and subcontractors in connection with this agreement, including the breach by [MBF] of its warranty as set forth herein, and (2) without limitation, the operation, inspection, maintenance, testing, alteration, and replacement, repair or removal of any facilities or equipment; whether caused by the negligence . . . or other legal fault, including strict liability, of [MBF], owner group, any third party or any of them, except to the extent such claims arise from the gross negligence or willful misconduct of owner group.

---

[6] "Owner group" is defined as "[Millennium] and the parent, subsidiary and affiliated companies of each and all of its entities and other respective employees, officers, directors, agents, representatives, invitees, contractors and subcontractors." (Kruse Aff. Ex. M ¶ 5.)

(*See* Kruse Aff. Ex. M. ¶ 5 (emphasis omitted).)

Millennium's relationship with Precision is governed by a construction contract. (*See* Kruse Aff. Ex. P.) That contract contains the following indemnification provision:

> Contractor Indemnity. To the fullest extent permitted by law, [Precision] agrees to release, defend and hold harmless [Millennium] . . . from and against any and all claims, demands, losses, damages (including punitive or exemplary), causes of action, suits and liabilities of every kind . . . for injury to or death of any person . . . directly or indirectly arising or alleged to arise out of or in any way incidental to the performance of this contract or any work performed hereunder . . . even though caused by or arising from the active, passive, joint, or concurrent negligence, or other legal duty, or fault of any indemnitee. It is the intent of [Precision] to indemnify the indemnitees from [Precision's] own negligence, actions and omissions. It is not the intent of [Precision] to indemnify the indemnitees for indemnitees' sole negligence, actions and omissions

(*Id.* Ex. P ¶ 35.1 (emphasis omitted).)

### D. Procedural History

Plaintiff commenced this action by filing a complaint against Millennium and MBF on August 1, 2008. On January 22, 2009, Millennium filed a third-party complaint against Precision. On February 5, 2009, Precision answered and asserted a cross-claim against Millennium for contribution and indemnification. On April 9, 2009,

5

Plaintiff filed an amended complaint, after which Millennium and MBF both answered and asserted cross-claims against one another. On June 1, 2009, Precision added a cross-claim against MBF.

Discovery closed on October 8, 2009. On December 1, 2009, the parties filed their respective motions for summary judgment, which became fully submitted on January 20, 2010.

## II.  DISCUSSION

### A.  Standard of Review

A court may grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *accord Anderson*, 477 U.S. at 248. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).

### B.  Plaintiff's Claims

Plaintiff brings claims against Millennium and MBF pursuant to New York Labor Law Sections 200, 240(1) and 241(6) and for common law negligence for McCaffrey's conscious pain and suffering and wrongful death. (Am. Compl. ¶¶ 37, 41.) Plaintiff has abandoned her common law and Labor Law Section 200 claim against Millennium. (*See* Pl.'s Rule 56.1 Counter-Statement to Millennium ¶ 1.)

1. New York Labor Law § 240(1)

Section 240(1) of New York's Labor Law "imposes absolute liability on owners or contractors or their agents for injuries proximately caused by a failure to provide safety devices necessary for protection to workers subject to the risks inherent in elevated work sites." *Agric. Ins. Co., Inc. v. Ace Hardware Corp.*, 214 F. Supp. 2d 413, 417 (S.D.N.Y. 2002); *accord* N.Y. Labor Law § 240(1); *Wilson v. City of N.Y.*, 89 F.3d 32, 36 (2d Cir. 1996) ("The duty is nondelegable and the liability is strict; so long as the violation of the statute was the proximate cause of the worker's injuries, the owner will be liable even though it exercised no supervision or control over the plaintiff's work."). Plaintiff now moves for summary judgment that Millennium and MBF are liable for McCaffrey's injuries under this provision.

a.  Scope of § 240(1)

The first issue raised by Plaintiff's motion is whether Section 240(1) applies to the accident that killed McCaffrey. Section 240(1) provides that "[a]ll contractors and owners . . . shall furnish or erect, or cause to be furnished or erected . . . scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and

6

other devices which shall be so constructed, placed and operated as to give proper protection to [workers]." N.Y. Labor Law § 240(1). Although once known as the "scaffold law," *see Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 499 (1993), it is now settled that Section 240(1) it is to be construed "as liberally as may be" to achieve its purpose of "plac[ing] the ultimate responsibility for building practices on the owner and general contractor in order to protect the workers who are required to be there but who are scarcely in a position to protect themselves from accidents," *Lombardi v. Stout*, 80 N.Y.2d 290, 296 (1992). Of course, it is axiomatic that the statute will only protect workers from those occupational hazards — elevation-related risks — that the statute is intended to cover. For the reasons that follow, the Court concludes that section 240(1) applies to the hazards that caused the fatal accident.

As an initial matter, there is no dispute that the pipeline was a structure within the meaning of the statute, which has been interpreted to apply to "any production or piece of work artificially built up or composed of parts joined together in some definite manner." *Lewis-Moors v. Contel of N.Y., Inc.*, 78 N.Y.2d 942, 943 (1991) (internal quotation marks and citation omitted) (affirming lower court's ruling that "a telephone pole with attached hardware, cable and support systems constitutes a structure within the meaning of that section").

The possibility of a side-boom, suspending a 35,000-pound pipeline, tipping over due to its load and rolling down a steep embankment is unquestionably an "elevation-related" hazard. The Court of Appeals has described the risks that Section 240(1) is intended to guard against:

All entail a significant risk inherent in the particular task because of the relative elevation at which the task must be performed or at which materials or loads must be positioned or secured. The contemplated hazards are those related to the effects of gravity where protective devices are called for either because of a difference between the elevation level of the required work and a lower level or a difference between the elevation level where the worker is positioned and the higher level of the materials or load being hoisted or secured.

*Rocovich v. Consol. Edison Co.*, 78 N.Y.2d 509, 514 (1991).

Each report of McCaffrey's accident concludes that the accident was caused by a "weight shift" between the two side-booms that occured just as they had finished lifting the piece of pipe. (*See* Kownacki Decl. Ex. B; *id.* Ex. D at 2.) As the weight shifted, McCaffrey's side-boom flipped over backwards and, after briefly righting itself, continued rolling down the hill. (*See id.* Ex. B.) After McCaffrey jumped or was ejected from the side-boom, it proceeded to roll over three to five more times, once directly on top of him. (*Id.*) Thus, in the words of Section 240(1), the side-boom was neither "placed" in a manner to give proper protection to McCaffrey, in this case on a steep slope, nor was it "operated as to give proper protection" to McCaffrey, in this case by not being secured to other equipment or in some other manner to avoid it toppling over.

New York courts frequently award summary judgment under Section 240(1) to plaintiffs who were injured when machinery tipped over. *See Ali v. Richmond Indus.*

7

*Corp.*, 873 N.Y.S.2d 207, 208 (2d Dep't 2009) (awarding summary judgment where a crane had fallen or tipped over because of inadequate maintenance); *Fitzsimmons v. City of N.Y.*, 831 N.Y.S.2d 441, 442-43 (2d Dep't 2007) (awarding summary judgment to plaintiff who established that crane had fallen over and landed on him); *Cosban v. N.Y.C. Transit Auth.*, 641 N.Y.S.2d 838, 840 (1st Dep't 1996) (awarding summary judgment to plaintiff who established that the crane he was operating fell over and he was injured when he either fell from or was ejected from it). Perhaps most helpful to analyzing the September 15, 2007 accident is *Bilderback v. Agway Petroleum Corp.*, 586 N.Y.S.2d 152 (3d Dep't 1992). In *Bilderback*, an employee had jumped on the back of a forklift unloading pallets of material in order to act as a counter-weight. *Id.* at 153. As a heavy pallet was unloaded from a truck, the forklift tipped forward and the employee was flung over the top of it, sustaining injuries. *Id.* The Court concluded:

> Defendant contends that Supreme Court erred in granting summary judgment to plaintiff in that plaintiff was not engaged in an activity covered by Labor Law § 240(1). We disagree. Because the forklift was being used as a hoist to lift sacks of sandbags and the injury occurred because of the force of gravity upon the elevated load, the failure to supply an adequate hoisting device to protect plaintiff clearly violated Labor Law § 240(1). The injury to plaintiff was attributable to the instability of the forklift in hoisting sand loads beyond its capacity. Labor Law § 240(1) requires that workers be provided with proper safety equipment under such circumstances.

(*Id.* at 373-74.) Given this clearly defined case law, the Court concludes that the accident that killed McCaffrey falls within the scope of Section 240(1).

### b. Forseeability

Where "an intervening act" of "such an extraordinary nature or so attenuated from the defendants' conduct" is the cause of an injury, Section 240(1) will not impose liability. *See Gordon v. E. Ry. Supply, Inc.*, 82 N.Y.2d 555, 562 (1993). MBF contends that, because the precise cause of the weight-shift was not determined, it was sufficiently unforeseeable as to foreclose liability. (MBF's Opp. 6.) This argument is meritless. It is not necessary that a plaintiff establish the precise cause of the gravity-related incident in order to obtain summary judgment on a Section 240(1) claim. *See Cosban*, 641 N.Y.S.2d at 840 ("[W]e find unpersuasive the argument that plaintiff's motion for summary judgment was properly denied because he failed to demonstrate . . . how the accident [the toppling of a crane] occurred."). Accordingly, the Court rejects the argument that the risk of the side-boom overturning due to its load was so unforeseeable as to fall beyond the scope of Section 240(1).

### c. Proximate Cause

Where a worker's negligence is the *sole* proximate cause of a workplace accident, Section 240(1) does not impose liability. *See Cahill v. Triborough Bridge & Tunnel Auth.*, 4 N.Y.3d 35, 39 (2004). A prime example of this principle is the so-called "recalcitrant worker," who refuses to use a safety device despite repeated instructions to do so. *See, e.g.*, *id.* (reversing grant of summary judgment where jury could find that employee had been repeatedly instructed to use a safety line while climbing

a wall and refused to do so); *Negron v. City of N.Y.*, 803 N.Y.S.2d 664, 665-66 (2d Dep't 2005) (granting defendant summary judgment where plaintiff's injuries were due solely to his failure to tie himself off while working at elevation, as he had been instructed to do).

Even if a worker is not specifically instructed to use a particular safety device, liability will not attach where the worker's own "willful or intentional" actions are the sole proximate cause of his injuries. *Tate v. Clancy-Cullen Storage Co., Inc.*, 575 N.Y.S.2d 832, 834 (1st Dep't 1991); *accord Robinson v. E. Med. Ctr., LP*, 6 N.Y.3d 550, 554 (2006) ("Where a plaintiff's actions are the sole proximate cause of his injuries, liability under Labor Law § 240 does not attach." (internal quotation marks and alterations omitted)). In *Robinson*, for example, the plaintiff was injured while working overhead and standing on a six-foot ladder. *Id.* at 552. It was undisputed that "plaintiff knew that he needed an eight-foot ladder in order [to complete the task]. He acknowledge[d] that there were eight-foot ladders on the job site, that he knew where they were stored, and that he routinely helped himself to whatever tools he needed." *Id.* at 554-55. Given these circumstances, the Court of Appeals ruled that the plaintiff's injuries were attributable solely to his own conduct. *Id.* at 555.

Similarly, in *Plass v. Solotoff*, the Second Department upheld a grant of summary judgment to a defendant where the plaintiff's injuries occurred solely because he laid only one plank on top of his scaffolding instead of all three that were available and should have been used. 773 N.Y.S.2d 84, 85-87 (2d Dep't 2004). The sole-proximate-cause defense, however, "must logically be limited to the situation where a worker has been provided with proper protection, and the worker, thereafter, through intentional misuse of the safety device, or via other egregious misconduct, neutralizes the protection afforded by the safety device." *Robinson v. City of N.Y.*, 779 N.Y.S.2d 757, 761 (Sup. Ct. 2004) (internal quotation marks and citations omitted).

Defendants contend that McCaffrey's failure to wear his seatbelt was the sole proximate cause of the injury. Even assuming that McCaffrey was negligent in not wearing his seatbelt, however, the fact that the side-boom flipped and rolled down the embankment was also a proximate cause of McCaffrey's injuries and death. *Cf. Zimmer v. Chemung Cnty. Performing Arts, Inc.*, 65 N.Y.2d 513, 524 (1985) ("[W]here there is no view of the evidence at trial to support a finding that the absence of safety devices was not a proximate cause of the injuries, the court may properly direct a verdict in the plaintiff's favor."). Here, McCaffrey's failure to wear a seatbelt is, at most, contributory negligence, which is not a bar to recovery under Section 240(1). *See Bland v. Manocherian*, 66 N.Y.2d 452, 459 (1985) ("[O]nce it is determined that the owner or contractor failed to provide the necessary safety devices required to give a worker proper protection, absolute liability is unavoidable under section 240(1) . . . regardless of the injured worker's own negligence in contributing to his accident."); *Aragon v. 233 W. 21st St., Inc.*, 201 607 N.Y.S.2d 642, 643 (1st Dep't 1994) ("[T]he proximate cause of the scaffold's collapse was the breaking of one of the supporting ropes, not the plaintiff's decedent's failure to wear a safety harness."); *Moniusko v. Chatham Green, Inc.*, 787 N.Y.S.2d 679, at *3 (Sup. Ct. 2004) (table) ("It is also clear that although the plaintiff, by having voluntarily removed his safety harness, may be largely responsible for the resultant

sixteen foot fall and the extent of his injuries, the fact remains that the proximate cause of the accident was a broken scaffold hook.").

Similarly, MBF maintains that the flipping and rolling over of the side-boom was caused solely by McCaffrey's placement and operation of it. In essence, MBF argues that the safe operation of each side-boom had been delegated to the individual operators, and that McCaffrey could have, for example, secured his side-boom to other equipment on the site to prevent it from tipping over. (*See* MBF Mem. 7.) This position is premised on the testimony of Precision's superintendant, Fisher, who stated that McCaffrey was an experienced side-boom operator and that Precision's policy with regard to safe operation was that "whatever they needed . . . was at their disposal, and if at any point they didn't want to work, they had the right to say no." (Fischer Dep. Tr. 120:13-18.)

To allow employers to simply "delegate" to their employees ultimate responsibility for their safety would violate both the purpose of Section 240(1) and the principle that an owner or contractor's liability under Section 240(1) cannot be delegated. The sole-proximate-cause cases should not "be read to impose the burden upon the worker to guarantee his own safety by requiring that he construct, place or operate the equipment in a proper manner." *Singh v. Barrett*, 596 N.Y.S.2d 45, 47 (1st Dep't 1993). Thus, McCaffrey's operation of the side-boom can be considered, at most, contributory negligence.

Accordingly, because Plaintiff has established that a violation of Section 240(1) has occurred and that it was at least a contributing factor to McCaffrey's injuries, and Defendants have failed to raise a triable issue of fact as to whether McCaffrey's actions constituted the sole proximate cause of the accident, Plaintiff is entitled to summary judgment on liability.

d.  Liability of Millennium and MBF

Liability under Section 240(1) is imposed on "[a]ll contractors and owners and their agents." N.Y. Labor Law § 240(1). "It is by now well established that the duty imposed by Labor Law § 240(1) is nondelegable and that an owner or contractor who breaches that duty may be held liable in damages regardless of whether it has actually exercised supervision or control over the work." *Ross*, 81 N.Y.2d at 500. Accordingly, there is no question that Millennium, as owner of the Millennium Pipeline project, falls within the class of persons liable for September 15, 2007 accident.

Whether MBF falls within the definition of "contractor" or "agent" for the purposes of Section 240(1) is a closer question that ultimately depends on whether it had the requisite amount of supervision or control over the accident. For a construction manager or inspector like MBF, liability under Section 240(1) depends on the nature of its responsibilities.[7] Only where the construction manager or inspector "had supervisory control and authority over the

---

[7] There is some dispute over what title accurately describes the work performed by MBF. Millennium's general counsel, Gary Kruse, stated that MBF acted as a construction manager and inspector (Kruse Dep. Tr. 9:23-10:5), while MBF's owner, Daniels, testified that MBF only provided inspection and not construction management services (Daniels Dep. Tr. 56:7-15.) Regardless of how the deponents labeled MBF's function, their descriptions of its role were consistent with one another, which is what matters for purposes of liability under Section 240(1). *See Starkey v. Capstone Enters. of Portchester*, No. 06 Civ. 1196 (KMK), 2008 WL 4452366, at *5 (S.D.N.Y. Sept. 30, 2008).

10

work being done when the plaintiff [was] injured" is liability imposed. *See Walls v. Turner Constr. Co.*, 4 N.Y.3d 861, 864 (2005). Nevertheless, New York courts have recently imposed liability on construction managers who are "delegated authority" to "oversee and control the work of the various on-site contractors, particularly with respect to safety issues." *See Barrios v. City of N.Y.*, 2010 WL 2758156, at *2 (2d Dep't July 13, 2010); *accord Lodato v. Greyhawk N. Am., LLC*, 834 N.Y.S.2d 242, 245 (2d Dep't 2007); *Robinson v. City of N.Y.*, 801 N.Y.S.2d 781 (Sup. Ct. 2005) ("[W]hen the particular contract calls for the construction manager to enforce safety regulations and stop the work when unsafe practices occur, the courts have reasoned that the construction manager has the requisite supervision and control of the work so as to render the construction manager liable as a statutory agent under the Labor Law.").

The record reveals that Precision, and not MBF, actually directed McCaffrey's work. The record is equally clear, however, that MBF was responsible for overall job-site safety and had the authority to stop any unsafe work, including McCaffrey's unsafe operation of the side-boom. (*See, e.g.*, Daniels Dep. Tr. 26:13-20 ("If it was a situation that [involved] [im]minent danger," the MBF inspector's duty and responsibility was to "stop the work [and] to notify the Millennium construction manager so he could take corrective action."); *id.* at 59:17-23 ("Q: If an MBF employee, for example a craft inspector, had his own concerns of the safety of an operator on a hill that he was working on, would it have been [the] MBF employee's responsibility to express that concern to someone? A: It would have. Q: If he failed to express that concern, would that be in contravention or in contradiction of his responsibilities and duties as MBF dictated them to be? A: It would.").)

The duty to control safety standards and the ability to halt work is sufficient to impose liability as a statutory agent. *See Nowak v. Smith & Mahoney, P.C.*, 494 N.Y.S.2d 449 (3d Dep't 1985) ("The key criterion is the right to insist that proper safety practices were followed and it is the right to control the work that is significant, not the actual exercise or nonexercise of control.") In contrast, where there is no ability to stop unsafe work or oversee other contractors, the contractor is not a statutory agent under Section 240(1). *See Hutchinson v. City of N.Y.*, 795 N.Y.S.2d 554, 555 (1st Dep't 2005) (finding no liability under Section 240(1) where defendant "had no duty to oversee the construction site and the trade contractors; and there was no evidence that [defendant's] representative had authority to control activities at the work site or to stop any unsafe work practices").

New York Courts have granted summary judgment to plaintiffs against contractors that performed functions like those undertaken by MBF. For example, in *Walls v. Turner Construction Co.*, the Court of Appeals affirmed a grant of summary judgment in favor of a plaintiff against a construction manager. 4 N.Y.3d at 864. The court described the duties of the contractor as follows:

> Turner assumed responsibility for contractual, statutory, and regulatory compliance by all other trade contractors involved in the school district's capital improvement project. If Turner became aware of any unsafe condition or practice at the work site that might constitute a hazard to users of the properties, it was contractually required to

11

"immediately direct the Trade Contractors to cease work which constitutes such unsafe practice or hazardous condition." In addition, Turner was to monitor performance by all trade contractors, enforce the terms of the trade contracts and take action within its reasonable control to minimize the loss of life and damage to property during emergencies. Turner was further required to periodically advise the owner and architect of safety issues and concerns.

*Id.* at 862.

MBF's duties were substantially similar. It had the duty to stop work if any unsafe work conditions occurred, including the unsafe operation of a side-boom. (*See* Daniels Dep. Tr. 59:17-23.) In addition, it was MBF's duty to "[a]ctively monitor and influence contractor work progress to ensure compliance with established scope, schedule, quality, and safety expectations" and to "document progress in daily/weekly progress reports." (Construction Management and Inspection Procedure § 2.1.) MBF was also obligated to "[c]oordinate project related activities required to be performed by operations personnel," "[r]eview and approve Contractor documentation (daily reports, invoices, etc.)," "[i]nitiate and support incident response, notification and investigation activities," "[f]acilitate appropriate planning and communication between the project team, the Contractor, and Operations, and ensure site-specific Operations requirements are identified and addressed." (*Id.*)

The Court concludes that a contractor like MBF — one with a ubiquitous presence at the worksite and responsibility for overall job-site safety and supervision and regulatory and contractual compliance — is a statutory agent within the meaning of Section 240(1). Accordingly, both Millennium and MBF are liable under the statute.

2. New York Labor Law § 241(6)

Defendant MBF seeks summary judgment on the ground that it cannot be found liable under New York Labor Law Section 241(6), "which requires owners and contractors to provide reasonable and adequate protection and safety for workers and to comply with the specific safety rules and regulations promulgated by the Commissioner of the Department of Labor." *See Ross*, 81 N.Y.2d at 501-02. The Court disagrees.

In order to establish liability under Section 241(6), a plaintiff must show a violation of a specific industrial regulation. *Id.* In this case, Plaintiff maintains that MBF is liable pursuant to New York industrial code sections 23-1.23, 23-1.7, 23-6.1, 23-8.1, 23-8.2 and 23-9.8. (Pl.'s Opp'n 11.) MBF counters that summary judgment is warranted because none of the industrial code sections relied on by Plaintiff is applicable. (*See* MBF's Mem. 11-14.)

At the very least, Section 23-8, which applies to "mobile cranes, tower cranes, and derricks" and requires that a firm footing be provided for their use, would appear to apply to the accident at issue in this case. *See* N.Y.C.R.R. § 23-8.2(b)(1). Alternatively, if the side-boom is not deemed to be a mobile crane, it would certainly qualify as a "material hoisting" device within the meaning of Section 23-6.1. That section requires that "hoisting machines shall be so constructed, installed

12

and secured in place as to prevent tipping or dislodgement." N.Y.C.R.R. § 23-6.1.[8]

Because the Court finds that at least one of the provisions of the industrial code applies to the operation of a side-boom like the one McCaffrey was operating, MBF's motion for summary judgment on Plaintiff's Section 241(6) is denied.

### 3. New York Labor Law § 200

MBF also seeks summary judgment on the ground that it cannot be found liable under New York Labor Law Section 200, which codifies the common law duty of general contractors and owners to provide a safe workplace. *See Comes v. N.Y. State Elec. & Gas Corp.*, 82 N.Y.2d 876, 877 (1993).

Unlike Sections 240(1) and 241(6), recovery against an owner or contractor under Section 200 "cannot be had unless it is shown that the party to be charged exercised some supervisory control over the operation." *Ross*, 81 N.Y.2d at 505. This requirement is "an outgrowth of the basic common-law principle that an owner or general contractor should not be held responsible for the negligent acts of others over whom the owner or general contractor had no direction or control." (*Id.* (internal quotation marks, citations, and alterations omitted).) Thus, in contrast to Section 240, liability under Section 200 will only attach where a contractor exercises more than general supervisory or safety responsibility. *See Ortega v. Puccia*, 866 N.Y.S.2d 323, 330 (2d Dep't 2008) ("A defendant has the authority to supervise or control the work for purposes of Labor Law § 200 when that defendant bears the responsibility for the manner in which the work is performed."); *O'Sullivan v. IDI Constr. Co., Inc.*, 813 N.Y.S.2d 373, 375 (1st Dep't 2006) ("[W]hile the general contractor's on-site safety manager may have had overall responsibility for the safety of the work done by the subcontractors, such duty to supervise and enforce general safety standards at the work site was insufficient to raise a question of fact as to its negligence."); *Singh v. Black Diamonds LLC*, 805 N.Y.S.2d 58, 60 (1st Dep't 2005) ("Moreover, the testimony . . . that he conducted regular walk-throughs and, if he observed an unsafe condition, had the authority to find whoever was responsible for the condition and have them correct it or, if necessary, stop the work . . . and that he had inspected the plywood in question after it had been nailed down over the hole . . . is insufficient to trigger liability."). Put another way, a plaintiff seeking to recover pursuant to Section 200 must demonstrate "that the contractor controlled *the manner in which the plaintiff performed his or her work*, i.e., how the injury-producing work was performed." *Hughes v. Tishman Constr. Corp.*, 836 N.Y.S.2d 86, 89 (1st Dep't 2007); *id.* at 91 ("That Tishman, Site Safety, or both, may have had the authority to stop work for safety reasons is insufficient to raise a triable issue of fact with respect to whether Tishman exercised the requisite degree of supervision and control over the work being performed to sustain a claim under Labor Law § 200 or for common-law negligence.").

Accordingly, Plaintiff has not raised a disputed issue of material fact as to whether MBF exercised the requisite control over the manner in which McCaffrey carried out his

---

[8] This subsection does not apply to "cranes, derricks, aerial baskets, excavating machines used for material hoisting and fork lift trucks," each of which has its own subsection governing proper use. *See* N.Y.C.R.R. § 23-6.1(a). Thus, only one of the two sections can apply.

job to be liable under Section 200.[9] (*See, e.g.*, Kruse Dep. Tr. 60:8-19 ("[O]ur understanding of the contractual relationship with MBF is that . . . they would not control the means by which Precision achieved the goals."). Accordingly, Plaintiff's Section 200 claim must be dismissed against MBF.

### C. Indemnification

Millennium, MBF, and Precision have all sought indemnification from at least one other Defendant or Third-Party Defendant. Millennium has sought contractual indemnification from both MBF and Precision. MBF, in turn, has brought a cross-claim for common law indemnification against Millennium. Finally, Precision has sued both MBF and Millennium for common law indemnification and sought contractual indemnification from MBF as a third-party beneficiary of the MBF-Millennium agreement.

Now before the Court is Millennium's motion for summary judgment on (1) its claims for indemnification against MBF and Precision, and (2) MBF and Precision's indemnification claims against it. In addition, MBF has moved for summary judgment on both Millennium and Precision's claims for indemnification against it.

### 1. Millennium's Indemnification Claims

#### a. MBF

Millennium is entitled to indemnification from MBF for any damages for which it is liable to Plaintiff. The indemnification clause states, in relevant part, that

> [MBF] shall reimburse [owner group] . . . and indemnify . . . [owner group] . . . from and against any and all claims . . . brought by . . . any person . . . for bodily injury or death to any person . . . arising, directly or indirectly, from (1) the activities of [MBF] . . . and (2) . . . the installation . . . of any facilities or equipment; whether caused by the negligence . . . or other legal fault, including strict liability of [MBF], owner group, any third party, or any of them.

(Kruse Aff. Ex. M ¶ 5 (emphasis omitted).) Because the MBF-Millennium agreement required MBF to oversee the safety of all operations, including of McCaffrey's side-boom, the claim clearly arose out of MBF's "activities." This conclusion must follow from the Court's finding that MBF acted as Millennium's statutory agent with respect to the accident.

MBF nevertheless seeks to avoid summary judgment, arguing that a jury could find that Millennium was negligent in failing to promulgate specific safety guidelines for the operation of side-booms on the slopes of the right-of-way and that, therefore, the contractual indemnification provision is at least partially void under New York General Obligations Law § 5-322.1. (*See* MBF Mem. 25.) MBF provides no authority for the proposition that an owner owes a duty to promulgate any safety regulations for worksites in which it does not supervise or control the work. In fact, an owner cannot be found to be negligent unless it controlled or supervised the method or manner in which the work was performed. *Comes*, 82 N.Y.2d 876, 877 (1993) ("Where the alleged defect or

---

[9] The lone case cited by Plaintiff in support of their Section 200 claim against MBF was not a Section 200 claim at all; it was for relief under Section 240(1). *See Greaves v. Obayashi Corp.*, 877 N.Y.S.2d 299 (1st Dep't 2009).

14

dangerous condition arises from the contractor's methods and the owner exercises no supervisory control over the operation, no liability attaches to the owner under the common law or under Labor Law § 200."); *Jenkins v. Walter Realty, Inc.*, 898 N.Y.S.2d 56, 57 (2d Dep't 2010) (where injury is caused by method of work, owner must have "authority to supervise or control the performance of [employee's] work" to be liable in negligence). There is no evidence that Millennium did so here.

Accordingly, MBF must indemnify Millennium for any damages that Plaintiff is awarded.

### b. Precision

Millennium also moves for summary judgment on its contractual indemnification claim against Precision. Precision does not challenge Millennium's entitlement to indemnification under the contract but rather argues that any claim is barred or premature because of New York's antisubrogation rule.

"The antisubrogation rule . . . prohibits an insurer from being subrogated to a claim against its own insured, at least when the claim arises from an incident for which the insurer's policy covers that insured." *Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae*, 674 N.Y.S.2d 280, 289 (1st Dep't 1998) (internal quotation marks and citations omitted); *see also id.* ("To allow the insurer's subrogation right to extend beyond third parties and to reach its own insured would permit an insurer, in effect, to pass the incidence of the loss from itself to its own insured and thus avoid the coverage which its insured purchased." (internal quotation marks and citations omitted)). Accordingly, where a single insurance policy covers two insureds, one cannot seek indemnification from the other for covered losses.

In its opposition to Millennium's motion, Precision has submitted affidavits from its primary insurance carrier, Zurich American Insurance Company, and its excess insurer, Axis Surplus Insurance Company. (*See* Precision's Counter-Statement to Millennium's 56.1 Exs. A-B.) Pursuant to the contract between Millennium and Precision, Millennium was also named as an insured under each policy. Millennium tendered its defense and indemnification to Zurich for McCaffrey's claim, and Zurich accepted it up to the $1,000,000 policy limit, without issuing any disclaimer or reservation of rights. (Affirm. of James McLoughlin of Zurich, ¶ 2.) In addition, Zurich "acknowledged Millennium's entitlement to a defense and indemnity under Millennium's contract with Precision" by assigning Millennium's counsel to represent and defend it in this matter. (*Id.*) Axis has also acknowledged that it is obligated to cover the loss, up to the $5,000,000 policy limit, without any disclaimer or reservation of right, subject only to the "other insurance" clause of its policy and New York insurance law regarding priority of coverage. (Affirm. of Harold Bennett of Axis ¶ 2-3.) Axis takes the position that its policy is excess over a general commercial liability policy issued by Liberty Mutual to Millennium. (*Id.* Ex. A.)

Precision maintains that the antisubrogation rule prohibits Millennium from prevailing on its indemnification claim. The rule does not, however, bar a separate insurer, like Liberty, from seeking indemnification or subrogation. *Lodovichetti v. Baez*, 818 N.Y.S.2d 470, 470 (2d Dep't 2006) ("The antisubrogation rule applies only to the policy limits of the comprehensive general liability policy at issue, and claims for contribution and/or indemnification beyond the limits of a

15

common insurance policy are not barred."). Thus, even though the antisubrogation rule bars Zurich and Axis, as Millennium's subrogees, from seeking indemnification from Precision for the loss amounts that they cover, it does not bar Liberty, as Millennium's subrogee, from seeking indemnification for the potential gap in coverage between the Zurich and Axis policies, ostensibly covered by Liberty.

Accordingly, Millennium is entitled to indemnification from Precision for any gaps in coverage between or over the Zurich and Axis policies.

### 2. Precision and MBF's Claims Against Millennium

Millennium also seeks summary judgment that it does not owe common law indemnification to Precision or MBF.[10] In order to seek common law indemnification from the owner of a construction site for an injury arising from the methods of construction, a plaintiff must show that the owner supervised or controlled the work. *See Comes*, 82 N.Y.2d at 877. Because the Court has already determined that there is no evidence in the record from which a reasonable jury could conclude that Millennium did either, *see supra* Section II.C.1.a, it cannot be required to indemnify either MBF or Precision.

---

[10] Precision has not opposed this portion of Millennium's motion.

### 3. Precision's Claim Against MBF[11]

MBF seeks summary judgment on Precision's cross-claim for indemnification — brought pursuant to the Millennium-MBF contract — on the basis that Plaintiff's claims do not arise out of the activities of MBF within the meaning of the MBF-Millennium contract. (*See* MBF's Reply to Precision's Opp. 15.) The Court has already concluded that Plaintiff's claims did arise out of MBF's activities within the meaning of that agreement. *See supra* Section II.C.1.a. Accordingly, MBF's motion for summary judgment on Precision's indemnification claim is denied.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment as to her Labor Law Section 240(1) claim is granted in its entirety.

Millennium's motion for summary judgment is granted to the extent that it seeks (1) indemnification from MBF, (2) judgment in its favor on Plaintiff's Labor Law Section 200 claim, and (3) judgment in its favor on all cross-claims and counter-

---

[11] MBF's reply memorandum contains numerous infirmities that cannot be overlooked. First, it accuses Precision's counsel of placing itself in a conflict of interest by opposing MBF's motion because "Precision has asserted no affirmative claims against MBF." (MBF Reply to Precision's Opp. 1.) Precision has, in fact, asserted a cross-claim for indemnification against MBF. (*See* Doc. No. 34.) In addition, Precision's opposition memorandum does nothing to harm its own position; it simply makes a case for contribution and indemnification against MBF should it be found liable. In addition, MBF frequently refers to its own "claims against Precision." (MBF Reply to Precision's Opp. 1.) It has made none. Finally, the reply memorandum is 15 pages long — five pages more than this Court's page limitations allow. (*See* Individual Practices of the Honorable Richard J. Sullivan, 2.B.)

claims brought against it. Its motion for summary judgment is also granted against Precision to the extent that it seeks indemnification for losses not covered by the Zurich or Axis policies.

MBF's motion for summary judgment is denied except with respect to dismissing Plaintiff's Labor Law Section 200 claim.

The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 46, 49, 50, and 59. The parties shall appear for a conference on September 10, 2010 at 4:00 p.m., at which they should be prepared to discuss the estimated length of trial for the remaining issues and their availability for trial.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 1, 2010
      New York, New York

\* \* \*

Plaintiff Darlene McCaffrey is represented by David Kownacki and Andrew Leftt, Law Office of David P. Kownacki, P.C., 420 Lexington Avenue Suite 2031, New York, NY 10170. Defendant and Third-Party Plaintiff Millennium Pipeline Company, LLC is represented by Thomas Cerussi, Cerussi & Spring, One North Lexington Avenue, White Plains, NY 10601. Defendant MBF Services, Inc. is represented by David Persky, Law Offices of Edward Garfinkel, 110 William Street, New York, NY 10038. Third-Party Defendant Precision Pipeline LLC is represented by Raymond Slattery, Cartafalsa, Slattery & Metaxas, 165 Broadway, 28th Floor, New York, NY 10006.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/1/10